## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | **District:** Middle District of Florida, Ocala Division |
| --- | --- |
| **Name:**<br><br>JOHN WILLIAM CAMPBELL | **Docket or Case No.**<br><br>*5:22-CN-255TPB PRL* |
| **Place of Confinement:**<br>Columbia Correctional Institution<br>216 S.E. Corrections Way<br>Lake City, Florida 32025 | **Prisoner No.:**<br>DOC# D35843 |
| **Petitioner**<br><br>**JOHN WILLIAM CAMPBELL** | **Respondent**<br><br>v.  **SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, et al.** |

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   **Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida, 110 North Apopka Avenue, Inverness, Florida 34450**

   (b) Criminal docket or case number(s) (if you know):
   **2010-CF-1012**

2. (a) Date of the judgment of conviction (if you know):
   **January 25, 2013**

   (b) Date of sentencing:



CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA
2022 JUN -1  PM 12: 47
FILED

**June 23, 2021.** [1]

3. Length of sentence:

**Sentenced to life as to count one of the indictment for first degree murder, to life as to count two of the indictment for first degree murder, to life as to count three of the indictment for burglary while armed with a firearm and assault or battery, and to 15 years in prison as to count four for possession of a firearm by a convicted felon, to run concurrently.**

4.    In this case, were you convicted on more than one count or of more than one crime?

☐ Yes          ☒ **No**

5.    Identify all crimes of which you were convicted and sentenced in this case:

**One count of first-degree murder in violation of FLA. STAT. § 782.04(1)(a)(1)**

6.    (a) What was your plea? (Check one)

☒ **(1) Not guilty**          ☐ (3) Nolo contendere (no contest)
☐ (2) Guilty          ☐ (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ **Jury** (for initial guilt and penalty phase)
☒ **Judge only** (for second penalty phase proceedings)

---

[1] Petitioner was initially sentence to death on March 19, 2013. On February 21, 2017, the trial court granted Mr. Campbell a new penalty phase proceeding pursuant to *Hurst v. Florida*, 136 S. Ct. 616 (2016). A new penalty phase proceeding was conducted on June 7 -11, 2021. Mr. Campbell waived a jury. After hearing evidence presented by both sides, the trial court sentenced Mr. Campbell to life imprisonment without the possibility of parole on June 23, 2021.

7.      Did you testify at a pretrial hearing, trial, or a post-trial hearing?
        ☐ Yes              ☒**No**

8.      Did you appeal from the judgment of conviction?
        ☒**Yes**              ☐ No

9.      If you did appeal, answer the following:

        **DIRECT APPEAL**:

        (a)     Name of court:
                **Florida Supreme Court.**

        (b)     Docket or case number (if you know):
                **SC13-716**

        (c)     Result:
                **Affirmed.**

        (d)     Date of result (if you know):
                **March 5, 2015**

        (e)     Citation to the case (if you know):
                ***Campbell v. State*, 159 So. 3d 814 (2015)**

        (f) Grounds raised:

        1) **The trial court erred in finding the murder was especially heinous, atrocious, or cruel**
        2) **The trial court erred in finding that the appellant committed the murder in a cold, calculated and premeditated manner**
        3) **The trial court erred in finding as an aggravating circumstance that the killing was motivated by financial gain**
        4) **The death sentence is disproportionate when compared with similar cases where the aggravating circumstances are few and the mitigation, especially mental mitigation, is substantial.**
        5) **Florida's death sentencing scheme is unconstitutional**

**under the Sixth Amendment pursuant to *Ring v Arizona***

(f)    Did you seek further review by a higher state court?
☐ Yes      ☒**No**
**The Florida Supreme Court is the highest State reviewing court.**

If yes, answer the following:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Result:

(4) Date of result (if you know):

(5) Citation to the case (if you know):

(6) Grounds raised:

(h) Did you file a petition for certiorari in the United States Supreme Court?
☒ **Yes**          ☐ No

If yes, answer the following:
(1) Docket or case number (if you know):
   **No. 14-10121**

(2) Result:
   **Denied**

(3) Date of result (if you know):
   **October 5, 2015**

(4) Citation to the case (if you know):
   ***Campbell v. Florida*, 577 U.S. 848 (2015)**

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

        ☒**Yes**           ☐ No

11.    If your answer to Question 10 was "Yes," give the following information:

    (a)    (1) Name of court:
           **Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.**

           (2) Docket or case number (if you know):
           **2010-CF-1012**

           (3) Date of filing (if you know):
           **September 19, 2016.**

           (4) Nature of the proceeding:
           **Motion to Vacate Judgment and Sentence of Death (pursuant to Fla. R. Crim. P. 3.851)**

           (5) Grounds raised:

**CLAIM 1: MR. CAMPBELL'S INITIAL CONFESSIONS AND *MIRANDA* WAIVERS WERE INVOLUNTARY DUE TO TRAUMA, MEDICATIONS POLICE MISCONDUCT, AND COUNSEL'S FAILURE TO PROVDE PROMPT ASSISTANCE WHEN REQUIRED BY FLORIDA LAW. COUNSEL WAS INEFFECTIVE AB INITIO AND THEREAFTER, DEPRIVING MR. CAMPBELL OF RIGHTS SECURED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION.**

**CLAIM 2: TRIAL COUNSEL RENDERED PREJUDICAL INEFFECTIVE ASSISTANCE FOR FAILING TO OBJECT TO IMPROPER COMMENTS BY THE STATE THUS DENYING MR. CAMPBELL HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH**

AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION.

CLAIM 3: DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY INTRODUCING OR OPENING THE DOOR TO NONSTATUTORY AGGRAVATING CIRCUMSTANCES, NAMELY: FUTURE DANGEROUSNESS, ANTISOCIAL PERSONALITY DISORDER, PRIOR BAD ACTS, AND LACK OF REMORSE. AS A RESULT, MR. CAMPBELL WAS DENIED RIGHTS SECURED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION

CLAIM 4: DEFENSE COUNSEL RENDERED PREJUDICIAL INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE MITIGATION PRESENTATION, VIOLATING RIGHTS SECURED TO MR. CAMPBELL UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION.

CLAIM 5: CUMULATIVELY, THE COMBINATION OF PROCEDURAL AND SUBSTANTIVE ERRORS DURING THE GUILT AND PENALTY PHASE TRIALS DEPRIEVED MR. CAMPBELL OF THE FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND CORRESPONDING RIGHTS UNDER THE FLORIDA CONSTITUTION.

CLAIM 6: IN LIGHT OF *HURST*, *RING*, *APPRENDI*, AND *JONES*, MR. CAMPBELL'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION, THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION AND ARTICLE I, SECTIONS 15 AND 16 OF THE FLORIDA CONSTITUTION.

CLAIM 7: THE ENACTMENT OF HB 7101, A DIRECT RESULT OF *HURST*, DEMONSTRATES THAT SOCIETY'S STANDARDS OF

**DECENCY HAVE EVOLVED SUCH THAT A DEATH SENTENCE CANNOT CONSTITUTIONALLY REST UPON A BARE MAJORITY JURY RECOMMENDATION OF DEATH.**

**CLAIM 8: FLORIDA CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL FOR FAILING TO PREVENT THE ARBITARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY AND FOR VIOLATING THE GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF *FURMAN V. GEORGIA* AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.**

**CLAIM 9: FLORIDA'S LETHAL INJECTION METHOD OF EXECUTION IS CRUEL AND UNUSUAL PUNISHMENT AND WOULD DEPRIEVE MR. CAMPBELL OF DUE PROCESS AND EQUAL PROTECTION OF THE LAW IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION.**

**CLAIM 10: FLA. STAT. 945.10 PROHIBITS MR. CAMPBELL FROM KNOWING THE IDENTITY OF THE EXECUTION TEAM MEMBERS, DENYING HIM HIS CONSTITUTIONAL RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND CORREPSONDING FLORIDA CONSTITUTION PROVISIONS.**

**CLAIM 11: MR. CAMPBELL'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WILL BE VIOLATED AS MR. CAMPBELL MAY BE INCOMPETENT AT THE TIME OF EXECUTION.**

> (6) Did you receive a hearing where evidence was given on your petition, application, or motion?
>
> ☒**Yes**          ☐ No
>
> **At the case management conference, the trial court granted Claim 6 relying on *Hurst v. State*, 202 So. 3d 40 (Fla. 2016) and granted a new penalty phase; which was determined to be dispositive of the other penalty phase**

**claims in the motion (Claims 2 (subsections 2-5), 3, 4, 7, 8, 9, 10, and 11). An evidentiary hearing was held on June 8, 2017 as to Claims 1, 2 (subsections 1 and 6), and 5.**

(7) Result:
**Claims 1, 2 (subsections 1 and 6), and 5 were denied. Claims 2 (subsections 2, 3, 4, and 5), 3, 4, 7, 8, 9, 10, and 11 were dismissed as moot. Claim 6 was granted and Mr. Campbell's death sentence was vacated.**

(8) Date of result (if you know):
**The postconviction court issued a written order on August 30, 2017.**

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court:
**Florida Supreme Court**

(2) Docket or case number (if you know):
**SC18-260**

(3) Date of filing (if you know):
**February 16, 2018**

(4) Nature of the proceeding:
**Petition for Writ of Habeas Corpus**

(5) Ground(s) raised:

**GROUND 1: APPELLATE COUNSEL FAILED TO RAISE ON DIRECT APPEAL MERITORIOUS ISSUES WHICH WARRANT REVERSAL OF MR. CAMPBELL'S CONVICTIONS AND SENTENCES.**

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes            ☒ **No**

(7) Result:  **Denied.**

(8) Date of result (if you know):
**_Campbell v. State_, 271 So. 3d 914 (Fla. 2018) on November 29, 2018.**

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
☐ Yes            ☐ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on      your petition, application, or motion?
**Yes - the Supreme Court of Florida.**

(1) First petition:     ☒**Yes**     ☐ No
**Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851.**

(2) Second petition:    ☐ Yes        ☐ No

(3) Third petition:    ☐ Yes        ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:    **Not applicable.**

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

## GROUND ONE

**THE CIRCUIT COURT ERRED IN DENYING MR. CAMPBELL'S CLAIM THAT HIS INITIAL CONFESSIONS AND *MIRANDA* WAIVERS WERE INVOLUNTARY DUE TO TRAUMA, MEDICATIONS, AND POLICE MISCONDUCT, AND THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUPPRESS THOSE STATEMENTS, DEPRIVING MR. CAMPBELL OF RIGHTS SECURED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

### a. The facts surrounding the five police interrogations and Mr. Campbell's statements

In this case, trial counsel did not hire an appropriate expert to review

Mr. Campbell's medical records during the time frame of the five police

interrogations nor did they file a motion to suppress statements. As such, the

attorneys and the jury never learned about the high level of narcotics Mr. Campbell was prescribed, how he is personally opiate naive, and, most importantly, how those narcotics legally impaired him. The underlying facts about the five interrogations are from the record on direct appeal. All facts regarding Mr. Campbell's medical condition, specifically the types of narcotics he was prescribed and his impairment from those narcotics, were developed during postconviction.

On the afternoon of Tuesday, August 10, 2010, pursuant to a neighbor's inquiry, Citrus County Sheriff's Officers performed a "well-being check" on the victim's home and found him dead due to blunt trauma to the head. *Campbell v. State*, 159 So. 3d 814, 818 (Fla. 2015). Suspicion immediately fell on Mr. Campbell, his son, who had been living with the victim after his release from prison. On August 11, 2010, a manhunt ensued, which resulted in a high-speed chase where John Campbell removed his seatbelt, slammed the gas pedal to the floor of his vehicle and attempted suicide by ramming a blockade of patrol cars at nearly 100 miles per hour. *Campbell*, 159 So. 3d at 820. Mr. Campbell has numerous serious injuries, including a complex fracture in his leg that caused his bone to stick out. R17/510-11.[2] Mr.

---

[2] The record on direct appeal consists of twenty-four (24) volumes. Page references to the record on direct appeal are designated with R[volume number]/[page no]. The postconviction record on appeal is one (1) volume

Campbell was airlifted to Bayfront Hospital from the scene of the accident. He was accompanied by an officer on the helicopter and at the hospital, and has been in custody ever since. R16/373-75.

The first police interrogation of Mr. Campbell occurred in the intensive care unit of Bayfront Hospital on August 12 from 1:00 to 1:40 p.m., mere hours after emergency surgery. R17/430. The interrogating officers had attempted to interview Campbell earlier that morning, but were advised by hospital staff that Campbell was not yet medically able to give a statement. R16/412. Postconviction medical records revealed that Mr. Campbell was provided two strong, mind-altering painkillers on the afternoon of August 12 when he made his statements to law enforcement. Initially, Mr. Campbell was provided 192 milligrams per hour of intravenous Diprivan for eight hours before the interview, followed by 12 milligrams of Morphine in three doses between 8 a.m. and 12:15 pm. PC/916-17; *See* Postconviction Defense Exhibit G.[3] Diprivan causes, severe drowsiness, cognitive impairment, confusion, delirium, hallucinations and extreme sedation. PC/917. Even the

---

comprising of 2974 pages. Citations to the postconviction record will be cited as PC/[page number].

[3] Defense Exhibit G is a three-page chart drafted by postconviction expert Dr. James T. O'Donnell which summarizes all of the medications Mr. Campbell was taking before, during, and after each interrogation and the side-effects to each narcotic. PC/1929-31.

warning on the Diprivan packaging states, "DO NOT DRIVE OR DO ANYTHING THAT REQUIRES YOU TO BE AWAKE FOR 24 HOURS AFTER TREATMENT." PC/917-18. Mr. Campbell's breathing tube was taken out just moments before the interrogation began. R16/395-96.

The statement begins with the usual recitation by the officer of the date, time, place and participants, followed by *Miranda*[4] warnings, which Campbell acknowledged. R17/430-31. When asked about one of the robberies Campbell was accused of committing, he declined to answer. R17/434-35. The officer then confronted Campbell with the crime:

> DETECTIVE ATCHISON: Okay. Well, we found your -- we found your father and he's been murdered.
>
> JOHN CAMPBELL: Okay.
>
> DETECTIVE ATCHISON: And I think you know that. I mean, everything's obvious. You know that. You know, you're - the thing about it, John, is you're not – you're not a stupid person and I don't think that, you know, you're any type of monster or anything like that. You know, it is what it is and that's just the bottom line. I'm surprised at the lack of remorse. I thought you and your father was pretty close.

R17/435.

Campbell said, "I'm in a lot of pain right now." When asked if he was "mentally okay" he responded, "No. I want to fuckin' die . . . Until I die, I'm

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

not going to be at peace with myself . . . I won't stop trying to commit - to kill myself." R17/436. The transcript indicates that Campbell was crying and then asked for a lawyer, "anything about my dad, I want a lawyer." R17/438. This was followed by, "Unless y'all give me the death penalty, I don't want to talk." R17/439.

According to the officer's testimony, after the recording was turned off, Campbell asked if he could change his mind and was read his *Miranda* rights again. R17/440. Curiously, this was not recorded. R17/440. Campbell asked for pain medication for his knee and then said he would tell law enforcement what happened to his dad. R17/441. Campbell stated that he needed pain medications "to stop the pain and stop his head from spinning." R16/398. The officer went to the nurse's station and asked for the medication but the request was denied. R17/441-42. The officer told Campbell that the pain medications were on a schedule. R17/442. When the recording was turned back on, Campbell said "Oh, what's the use?" R17/442. Then he confessed to the crime. R17/448

Law enforcement took two more recorded statements on August 13, starting around 11:00 a.m. R17/461, 481. Medical records show that Mr. Campbell was given 32 milligrams of morphine in four doses between 5:10 am and 10:55 am on August 13 before his statements. PC/919. Morphine, a

strong opioid painkiller, causes confusion, amnesia, hallucinations, suspended judgement, disorientation, memory problems, impaired executive function, impaired deliberation, and enhanced impulsivity. PC/919; Defense Exhibit G. While he was under the influence of these drugs, Campbell admitted striking the victim a total of three times, the third and last time after about a five minute pause, because "I didn't want him to suffer." R17/492-96.

On August 16th, Mr. Campbell was released from the hospital and transported to the Citrus County Jail where the fifth and final police interrogation occurred at 3:51 p.m. R17/499, 503. Mr. Campbell was given 20 milligrams of high dose continuous release oxycodone and 10 milligrams of high dose oxycodone in two doses before he left the hospital. PC/920-21. These are strong opiate painkillers with long duration. *Id.* Continuous release high dose oxycodone can cause confusion, amnesia, hallucinations, disorientation, memory problems, suspended judgement and clouded thinking for more than 12 hours. *See* Postconviction Defense Exhibit G. While Mr. Campbell was taking high dose oxycodone, he admitted that he had been thinking about committing the crime for a few days. R17/504-05. That admission, decisive as to heightened premeditation if believed, was never corroborated by any other evidence in the case.

On August 17, 2010, the trial attorneys were appointed to the first of Mr. Campbell's cases, an unrelated robbery (2010-CF-892). PC/962, 964-65. *See* Defense Exhibit I at the Post-Conviction Hearing. Trial Attorney Michael Lamberti was present with Mr. Campbell at this first appearance hearing and testified that he only had a brief conversation with Mr. Campbell. PC/969. Later on the same day, an email was exchanged between trial counsels regarding Mr. Campbell, which stated: "We were appointed on Mr. Campbell's case . . . We need to see him ASAP . . . Apparently, CCSO interviewed him at the hospital (Bayfront) while he was on pain killers." PC/963. *See* Defense Exhibit H. It was not until August 20th, nearly nine days after Mr. Campbell's arrest, when he finally speaks with trial counsel in any substantive manner regarding his capital or noncapital cases. PC/973-74. *See* Defense Exhibit L, Handwritten Notes dated August 20, 2010 from 1:40 to 2:14 p.m.

During the numerous days between Mr. Campbell's arrest and his first contact with any attorney on his behalf, he provided police with five incriminating statements. Campbell testified at trial and admitted killing his father, but denied that it was something he had planned. R16/544. He said he had falsely claimed to have been thinking about committing the murder for a few days beforehand because he was suicidal at the time of the

statement and believed admitting premeditation was the only way to get the death penalty. R16/550-51.

### b. Relevant Facts From the Post-Conviction Evidentiary Hearing

Michael Lamberti and Devon Sharkey tried Mr. Campbell's case. Lamberti had been at the public defender's office for a little over a year when he was assigned to work with Mr. Campbell. PC/951, 954. Lamberti was the second chair attorney in charge of mitigation because he was not yet death qualified. PC/955. Lamberti immediately recognized that impairment might be an issue with Mr. Campbell's interrogations and he memorialized his impression after his first meeting with Campbell, "[a]pparently CCSO interviewed him at the hospital while he was on painkillers. He says he had to be extubated in order to have them talk to him." PC/963; Defense Exhibit H. Lamberti did not follow up on this concern. Lamberti thought that Mr. Campbell's medical records were obtained by "someone" but never reviewed them personally. PC/982-83.

Lamberti testified that Sharkey was lead counsel and decided not to file a motion to suppress any of Mr. Campbell's statements. PC/983. Lamberti said the last statement at the jail on August 16, 2010 was "very different" and we "didn't think we could suppress the statement when he was at the jail . . . and we wanted to use his hospital statements to kind of temper . . . show how

he was . . . how remorseful he was." PC/983-84. Lamberti thought there was no basis for moving to suppress the August 16 statement. PC/984.

Devon Sharkey had been second chair counsel in two death penalty cases before he was assigned to Mr. Campbell's case. PC/991-92. He became active in the case in December 2012 after prior first chair attorney, Daniel Lewan, retired. PC/996. Sharkey received Campbell's medical records and asked his personal sports-medicine doctor, Marc Hilgers, to review them. PC/1000. Hilgers was intended to "go through the paperwork and give me some kind of an idea of what was going on." PC/1001-02. Sharkey maintained there was a "paper trail" in the defense files for formally retaining Dr. Hilgers, but postconviction counsel found no such evidence. PC/1001-02. Sharkey testified, "If we were going in that direction, I certainly would have retained a toxicologist. I wasn't going to rely on Dr. Hilgers' opinion." PC/1001.

Sharkey conceded that the worst evidence in the case was Campbell's statement taken at the Citrus County Jail on August 16. PC/1003, 1018. Campbell had to take the stand at trial to counter this statement. PC/1019. However, neither Sharkey nor Lamberti hired a toxicologist or a pharmacologist to review Mr. Campbell's extensive prescriptions or entertained a motion to suppress based on Mr. Campbell's impairment on

August 12, 13, and 16 from significant doses of opiates including: Diprivan, Morphine, High Dose Oxycodone and OxyContin. In fact, defense counsel announced pre-trial that they were electing not to file a motion to suppress in this case without any further explanation. R21/54-55. Sharkey and Lamberti also never learned a critical fact revealed in the postconviction hearing: Mr. Campbell has an unusual sensitivity to opiates since he is "opiate naive."[5] PC/897-99.

Collateral counsel presented testimony at the evidentiary hearing of Dr. James T. O'Donnell, an expert pharmacologist, who testified in detail that Mr. Campbell's judgement was impaired by large doses of opiate painkillers during all five of his statements to police. Dr. O'Donnell prepared charts of drugs, dosages and effects that were admitted into evidence as Exhibit G. PC/913-14. Dr. O'Donnell received his Doctor of Pharmacy degree from the University of Michigan in 1971. Curriculum Vitae of James T. O'Donnell. *See* Defense Exhibit A. He is an Associate Professor of Pharmacology at Rush University Medical Center and he has had more than

---

[5] Dr. O'Donnell testified that being "opiate naive" means that the person has not developed a tolerance for opiates. PC/898. Although Mr. Campbell had prior experience with other drugs, as described during the penalty phase trial, he never abused opiates. *Id.* Thus, in analyzing Mr. Campbell's condition during these interrogations, "we're starting at the lowest threshold in the treatment." *Id.*

forty years of experience as a practicing pharmacist. *Id.* He serves on an Institutional Review Board with a group of clinicians and scientists who meet to evaluate risks and informed consent in investigational drug studies. PC/883. Dr. O'Donnell is the editor and primary contributor to six textbooks and has published more than 300 articles over the course of his career. PC/884. The circuit court found, "after listening to his curriculum vitae and reviewing the vitae of him, you'd be hard pressed to find a more qualified person in the United States other than Dr. James O'Donnell." PC/893.

Dr. O'Donnell was a course director at Rush Medical College and was very involved in the development of the curriculum for medical students. PC/879. He explained that a medical student gets one year of training in pharmacology and a physician in practice usually has a shallow understanding of pharmacology because physicians only work with a handful of drugs. PC/880-81. Unlike Dr. Hilgers, trial counsel's personal sports medicine doctor who has no known expertise with toxicology, Dr. O'Donnell has substantially greater experience than a physician because of the depth of his training and evaluation of thousands and thousands of patients. PC/880-82.

c. **Ineffective Assistance of Counsel for Failure to File a Motion to Suppress Statements When Statements Made Were Involuntary Due to Trauma, Medications and Police Misconduct**

Mr. Campbell was legally impaired by opiates during each of his five interrogations by law enforcement. His counsel never attempted to suppress any of the five statements he made while he was under the influence of Diprivan, Morphine, and Oxycodone. Trial counsel also never consulted with an expert pharmacologist who would have discovered Mr. Campbell's impairment during each interrogation. Since there was no other evidence presented at trial to suggest heightened premeditation, aside from Mr. Campbell's drugged confessions, counsel's errors were grievously prejudicial.

Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. Confessions given while under the influence should be suppressed when the confessor is unable to understand the meaning of his statements. Mr. Campbell's' five statements were all given under the influence of mind-altering drugs and should have been legally suppressed as involuntary.

If trial counsel would have retained an expert pharmacologist or toxicologist, like Dr. O'Donnell, they would have learned that Mr. Campbell had no tolerance for opiates because he was opiate naive. PC/897-99. Campbell was given Fentanyl, Diprivan, Morphine, and high-dose

Oxycodone between August 11 and August 16, 2010. PC/901-11. During each interrogation, Mr. Campbell was taking strong opiates, a cocktail of medications that Dr. O'Donnell testified causes cognitive impairment, including impaired deliberation, consideration, and judgement. PC/1929-31.

From Dr. O'Donnell's experience on Institutional Review Boards, he explained, "in a clinical situation, we would never allow a patient to consent to surgery or a procedure while they're on high-dose opiates." PC/908. "If they are on a drug that we know causes impairment, they can't consent." PC/908. The risk of Campbell's impairment only increased with the combination of drugs, mental distress, and injury. PC/910. If Mr. Campbell could not knowingly and voluntarily consent to medical treatment, he could never have properly understood the *Miranda* warnings provided by police prior to his interrogations or knowingly waived his right to remain silent and have counsel present.

When police interrogated Mr. Campbell on August 12 between 1 and 2 pm, he was impaired and recovering from a serious injury. Medical professionals had, moments earlier, removed his breathing tube. Mr. Campbell had been given three doses of four milligrams of intravenous Morphine at 8 am, 10:34 am, and 12:15 pm, immediately before his statements to police and had been on a 192 milligram per hour Diprivan drip.

PC/916-17. These drugs would have impaired Mr. Campbell, interfered with his ability to think clearly and appreciate consequences as they cause clouded thinking, suspended judgement, confusion, amnesia, hallucinations, disorientation, memory problems, enhanced impulsivity, impaired executive function and impaired deliberation. PC/919. Even opposing counsel would concede that freely and voluntarily waiving *Miranda* rights would require a patient to be awake. Mr. Campbell was impaired by strong opiates on August 12 when he waived his rights and was interrogated. PC/919. These statements were not freely or voluntarily made, and they should have been suppressed by his counsel.

The August 13 statements were much more detailed and damaging. R17/461, 481. This time Campbell admitted striking the victim a total of three times, the third and last time after about a five-minute pause. R17/492-96. Prior to this interrogation, Mr. Campbell was given high-dose Morphine intravenously, eight milligrams per hour. PC/919. Dr. O'Donnell testified that Morphine causes clouded thinking, suspended judgement, confusion, amnesia, hallucinations, disorientation, memory problems, enhanced impulsivity, impaired executive function and impaired deliberation.

Campbell was given doses at 5:10 am[6], 6:15 am, 9:40 am and 10:55 am. PC/53-54. Mr. Campbell was impaired when he was interrogated on August 13, and his statements could have been suppressed.

Mr. Campbell's last statement was taken in the medical wing of the Citrus County Jail on Monday, August 16 between 3 and 4 pm. R17/503. Mr. Campbell admitted that he had been thinking about committing murder a few days. R17/504-05. This admission could be decisive as to heightened premeditation because heightened premeditation was not corroborated by any other evidence in the case. Lamberti explained the August 16 statement was "very different." PC/983-84. Sharkey conceded that the August 16 statement was the "worst evidence in the case." PC/1003, 1018.

Yet, Mr. Campbell's statement on August 16 was no different from the statements on August 12 and 13 in one critical respect. Mr. Campbell's thinking, judgement, and deliberation were impaired by opiates. Mr. Campbell was given a 20-milligram dose of continuous release high-dose OxyContin with a twelve hour duration at 8:34 am and ten milligrams of high dose OxyContin with an eight hour duration at 8:35 and 11:24 am. PC/921-

---

[6] The transcript of Dr. O'Donnell's testimony states that Mr. Campbell was, "given doses at 5:00, 10:00, 6:15, 9:40 and 10:55 am." PC/919. Defense Exhibit G is clear that either Dr. O'Donnell misspoke or that his statement was improperly transcribed as the first dose was given at 5:10 (not two doses at 5:00 and 10:00).

22. When police interrogated Mr. Campbell at the Citrus County Jail, Mr. Campbell was impaired because he was experiencing the "full effect" of these three doses. PC/921. Dr. O'Donnell explained that he would never recommend any patient make decisions under the influence of opiates as a person "cannot decide . . . they can't deliberate clearly [t]hese drugs inhibit the ability to make decisions and people make bad decisions because they're not exercising judgement, they're not exercising controls." PC/922. "We don't allow them to do that in a clinical situation and we don't allow them to do that in a research situation." Dr. O'Donnell further explained that many chronic pain patients will cut back on their pain medications if they are going to see a lawyer, have to go to court, or have to make decisions. PC/922-23.

The trial court denied this claim in part by stating that trial counsel strategically chose not to file a motion to suppress because they believed the defendant's statements showed remorse and they did not think they would be able to suppress the fifth statement. PC/1183. However, strategic decisions must still be based on informed judgment of *all* the facts. The undisputed facts in this case show that the trial attorneys never hired a toxicologist or a pharmacologist to review Mr. Campbell's extensive medications during August 12, 13, and 16, including significant doses of Diprivan, Morphine, and High Dose Oxycodone. By failing to hire a qualified

expert, trial counsel also never learned a critical fact revealed in the post-conviction hearing: Mr. Campbell has an unusual sensitivity to opiates since he is "opiate naive." PC/897-99. By failing to hire a qualified expert, trial counsel never learned the effects that each of these narcotics has on Mr. Campbell in particular and that he was impaired during all five confessions. Thus, trial counsels' strategic decision was based purely on speculation that they could not get the fifth statement suppressed. The trial court cannot assess whether counsel made a reasonable strategic decision not to file a motion to suppress because counsel did not take all the necessary steps to make an informed decision. It is always thoughtful strategy to move to suppress questionable evidence and reassess after an unfavorable ruling. In this case, the lawyers failed to take even the first basic step toward protecting Mr. Campbell's right against self-incrimination while under the influence of mind-altering drugs.

Dr. O'Donnell's testimony was clear – patients with serious opiate-induced effects on judgement and memory do not always show outward signs of impairment. T/910. Interrogating detectives Breedlove and Atchison testified at trial that John Campbell showed no signs of impairment before his interrogations. R16/400, 415-16. Counsel never challenged this testimony. Laymen, law enforcement personnel, and even trial attorneys

have no expertise is assessing the effects of mind-altering substances on a person's ability to plan, think, or consent.

Dr. O'Donnell demonstrated how effective expert analysis and testimony could have been in supporting a motion to suppress arguing that confessions made under the influence of mind altering drugs and extreme pain are involuntary. Mr. Lamberti and Mr. Sharkey are both trained as lawyers, rather than medical professionals. Dr. O'Donnell explained that they misperceived the level of Mr. Campbell's impairment throughout the course of his treatment, especially on August 16 at the Citrus County Jail.

Trial counsel rendered prejudicial ineffective assistance of counsel under *Strickland v. Washington* because a reasonably competent attorney would have obtained a qualified expert to review Mr. Campbell's medical records and provide an opinion as to his mental and physical state at the time each interrogation took place. Instead, Mr. Lamberti failed to recognize this issue and Mr. Sharkey casually inquired about it from an unquailed friend. But for this error, Mr. Campbell's trial would have had a different result. There is a reasonable chance that had the statements been properly suppressed, Mr. Campbell could have received a verdict to a lesser included charge, which was trial counsel's admitted strategy. Trial attorney Sharkey testified that the defense guilt phase strategy was to attack the premeditation

element of first degree murder in order to "get a crack at second degree murder." PC/1002. In his view, the worst evidence the State had on both counts was the statement the police took from Campbell when he was at the Citrus County Jail on August 16. PC/1003; PC/1018. He agreed that that statement was a sort of "tipping point" between premeditation and heightened premeditation. PC/1018. The defense decision to put Mr. Campbell on the stand was made in part to "counter that statement, to try to give a version of events that reduced premeditation" PC/1019.

Aside from Mr. Campbell's impaired confessions, there was no other evidence presented at trial to suggest heightened premeditation. Since the defense strategy was to attack the premeditation element, any reasonable attorney in that case would have done anything to suppress all of Mr. Campbell's confessions pre-trial. Trial counsel rendered prejudicial ineffective assistance by not hiring an expert which would have supported a motion to suppress based on trauma, medication and impairment. But for counsels' errors, there is a reasonable probability that Mr. Campbell would have had his statements suppressed and would have obtained a lesser included charge at trial. Because of this, the court's confidence in the outcome is undermined and the trial counsels' performance was deficient under *Strickland*.

(b)    If you did not exhaust your state remedies on Ground One, explain why: **Not applicable.**

(c)    **Direct Appeal of Ground One:**
(1) If you appealed from the judgment of conviction, did you raise this issue?
☐ Yes          ☒ **No**

(2) If you did not raise this issue in your direct appeal, explain why:
**It could not be raised in the direct appeal because it pertains to the denial of relief of Mr. Campbell's postconviction motion based on ineffective assistance of trial counsel.**

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?    ☒ **Yes**      ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
**Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851.**

Name and location of the court where the motion or petition was filed:
**Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.**

Docket or case number (if you know):
**2010-CF-1012**

Date of the court's decision:
**August 30, 2017**

Result (attach a copy of the courts opinion or order, if available):
**Denied.**

29

(3) Did you receive a hearing on your motion or petition?
        ☒ **Yes**        ☐ No

(4) Did you appeal from the denial of your motion or petition?
        ☒ **Yes**        ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
                ☒ **Yes**        ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
**Supreme Court of Florida, 500 South Duval Street, Tallahassee Florida 32399.**

Docket or case number (if you know):
**SC17-1725**

Date of the court's decision:
**November 29, 2018.**

Result (attach a copy of the court's opinion or order, if available):
**Denied**.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:
        **Not applicable.**

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:
        **There are no other available procedures.**


## GROUND TWO

**THE TRIAL COURT ERRED IN DENYING MR. CAMPBELL'S CLAIM THAT TRIAL COUNSEL PROVIDED PREJUDICAL INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO**

**PROVIDING PROMPT ASSISTANCE AND ERRED IN EXCLUDING THE TESTIMONY OF A DEFENSE EXPERT AT THE EVIDENTIARY HEARING IN SUPPORT OF THIS CLAIM.**

(a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

This case involved a sensational murder on August 10, 2010, followed by a high speed chase ending in a massive collision with a patrol car and Campbell's one day later. It hit the news at latest the evening of the day after. The location of the murder in Citrus County, the identification of the defendant by name, his status as a "person of interest," his location at the Bayfront Medical Center a relatively short drive away, and other indications that the case was headed for the Fifth Circuit Public Defender's Office were common knowledge by August 12. Counsel failed to make contact with Campbell or otherwise provide him with any assistance until a week after that, on August 17. During the time that Mr. Campbell was at the hospital and then transferred to the Citrus County Jail he was repeatedly questioned by the police and made admissions that were devastating to innocence and his ability to avoid a capital sentence. All relevant authority and attorney testimony presented in these proceedings and anywhere else in the practice of criminal defense agree that a reasonably competent lawyer would and should advise the defendant not to speak to the police under these circumstances. When Mr. Campbell eventually did receive the advice of

counsel, he signed forms invoking his rights to counsel and remain silent when they were offered to him. Unfortunately, due to the ineffectiveness of his trial counsel, legal assistance came to John Campbell a week too late.

### a. Trial Counsel Rendered Prejudicial Ineffective Assistance of Counsel for Failure to Provide Prompt Assistance When Required to By Law

Mr. Campbell has the right to assistance of counsel in all criminal prosecutions and that the right to assistance of counsel attaches at least as early as the defendant's first appearance which should occur within twenty-four hours of arrest. Mr. Campbell was under arrest from the moment of the car crash and has been in custody ever since. As trial counsel Lamberti testified at the evidentiary hearing, "When I watched the video and the police officer had his foot in Mr. Campbell's back, I think that was the point where he was being detained." PC/982.

The ABA Guidelines for the Appointment and Performance Of Defense Counsel in Death Penalty Cases, reprinted at 31 Hofstra L. Rev. 913 (2003) (ABA Guidelines) provides:

GUIDELINE 10.5--RELATIONSHIP WITH THE CLIENT

A. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.
B. 1. Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

2. Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards. . . .

Commentary
The Problem
Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but also to try to prevent **uncounseled confessions or admissions** and to begin to establish a relationship of trust with the client. Anyone who has just been arrested and charged with capital murder **is likely to be in a state of extreme anxiety**. Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; **they may be depressed and even suicidal**; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."

ABA Guidelines (emphasis added). Likewise, ABA Standards for Criminal Justice: Defense Function Standard 4-3.6 ("Prompt Action to Protect the Accused"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993) provides: "Many important rights of the accused can be protected and preserved only by prompt legal action. Defense counsel should inform the accused of his or her rights at the earliest opportunity and take all necessary action to vindicate such rights."

The United States Supreme Court has referred to the ABA standards as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). Almost all of the concerns listed in the Guidelines are implicated in this case. Counsel needed to "try to prevent uncounseled confessions or admissions." Campbell was obviously "in a state of extreme anxiety." He had "mental illnesses or personality disorders" that made him "highly distrustful" and that impaired his reasoning and perception of reality; and he was highly "depressed and even suicidal." The contention here is that the local Public Defender's Office had an obligation according both to Florida law and as reasonably competent capital defense counsel to make contact with Campbell and take other appropriate action the evening of August 12, or at latest the first thing next morning, with or without a court order.

Assistant Public Defender and second chair counsel in this case, Mr. Lamberti, was the first attorney to meet with Mr. Campbell, which he did at a first appearance hearing in the Citrus County Jail on August 17. PC/969. He was there handling first appearances for other clients and as a matter of routine, because of the seriousness of the case, he stepped in and handled Mr. Campbell's as well. PC/963. He already knew the circumstances of the car crash and said that "we had some knowledge of that in the office."

PC/968. He acknowledged regularly reading the Citrus County Chronicle and reading about this case there. PC/968.

Campbell was in a stretcher "and "did not look comfortable." PC/963. Later that day he sent an email to relevant persons in the Public Defender's Office, including Mr. Lewan, describing this encounter. *See* Defense Exhibit H. "We were appointed on Mr. Campbell's case . . . We need to see him ASAP . . . Apparently, CCSO interviewed him at the hospital (Bayfront) while he was on pain killers." *Id.*

Mr. Lamberti was questioned about conducting first appearance hearings outside of the jail or courtroom. He admitted that doing so was "very rare" but he has participated in one or two occasions where a Hernando County judge held a first appearance hearing at a hospital. PC/966. He testified, "The one I specifically remember the person [not Mr. Campbell] was significantly injured and it was . . . a high-profile type case, meaning first-degree felony or murder or something to that effect." PC/967.

Mr. Lamberti testified that he attended almost every Florida based death seminar since 2010. PC/976. In particular he remembered a presentation titled "Rapid Response", although he didn't remember when it was given. PC/977. He described its message as the following:

> Get to the person as soon as you can . . . It gives you the
> opportunity to begin looking for evidence . . . like cell phones

> and things like that, that may get lost through time. It gives you the opportunity to discuss with the client some of the circumstances surrounding the event, as well as making sure [the clients] don't talk to law enforcement.

PC/977. Mr. Lamberti said that at the time of Mr. Campbell's arrest in 2010 the public defender's office did not have any formal mechanism for tracking high profile cases, including homicides that might be coming into the office. PC/978. Now, in the bigger counties, the supervisors "keep an eye on things." PC/978. In 2010, the office policy was that a member of the public defender's office would contact a client within 72 hours of his arrest, but Lamberti clarified that that would only be after a formal court appointment. PC/979. Lamberti testified that "in a rare circumstance . . . I have gone out to talk to a client before we've been appointed and those circumstances are where we know we're going to be appointed." PC/980-81.

Devon Sharkey eventually became the lead trial attorney in this case after Daniel Lewan retired in 2012, so his direct knowledge of the circumstances surrounding Campbell's arrest, interrogation, and any response by the Public Defender's office was limited. PC/997. Nevertheless, his experience and position within the office provides insight into office policies and the standard of practice in cases like this one in 2010.

Sharkey testified that the defense guilt phase strategy was to attack the premedation element of first degree murder in order to "get a crack at

second degree murder." That guilt phase strategy was consistent with the penalty phase attack on the element of heightened premeditation for CCP. PC/1002. In his view the worst evidence the State had on both counts was the statement the police took from Campbell when he was at the Citrus County Jail on August 16. PC/1003; 1018. He agreed that that statement was a sort of "tipping point" between premeditation and heightened premeditation. PC/1018.[7] The defense decision to put Mr. Campbell on the stand during the guilt phase was made in part to "counter that statement, to try to give a version of events that reduced premeditation." PC/1019. The decision not to file a motion to suppress in this case was made because Mr. Sharkey felt that the earlier statements in the hospital "contradicted or kind of rebutted the heightened premeditation of the last statement." PC/1020.

Mr. Sharkey testified that he also has made contact with potential clients prior to their first appearance hearing. In high publicity cases his general practice is that, "If I'm aware of somebody we can get access to, I will try to send an investigator out there to have them sign an invocation of rights

---

[7] The fifth and final police interrogation occurred in the medical wing of the Citrus County Jail. R17/499, 503. This statement is different from the others in that this time Campbell admitted that he had been thinking about committing the murder for a few days. R17/504-05. That admission, decisive as to heightened premeditation if believed, was never corroborated by any other evidence in the case.

forms and things like that. . . as soon as practical." PC/1004. Mr. Sharkey has

routinely attended capital defense CLE courses and agreed that they teach

contacting a potential capital defendant as quickly as possible. PC/1004-05.

"That has been something that has been taught at these seminars. They talk

about trying to get . . . a doctor or a psychologist out to see them as soon as

possible, see if you can get a blood sample, thing like that. . . that's something

that I've heard and I've taken to heart and tried to act upon." Mr. Sharkey

agreed that obtaining an "invocation of rights in order to prevent the kinds

of statements that occurred here" was "a sound practice, if practical."

PC/1005. He further stated:

> If somebody's picked up for a homicide, even before we've been
> appointed, I will try to send an investigator out there or I'll go
> out there myself or another attorney will go out there and say.
> You know "sign these forms, don't talk to anybody. We'll do that
> if we . . . know about the case and know that we can reach them.

PC/1016-17.

Mr. Sharkey said that his office was routinely required to cover

hearings that were conducted outside the courtroom, such as those

conducted at the jail, and Baker and Myers Act hearings. PC/1007. Mr.

Sharkey also denied that there were any internal restrictions or office policies

on an attorney or public defender investigator speaking with a potential

client about as yet uncharged crimes. PC/1016 He also denied that there were

any external restrictions such as limited budgets or staff. PC/1016. Sharkey

continued:

> I'm not aware of anything that would prohibit us from doing that. . . I've had cases where I've had murder suspects who've sat in jail on non-murder charges for months before the state files an information and we'll certainly discuss what might be coming and start to work on that. . . I've had cases where people have been in custody without bonds or on very high bonds on one charge and we are pretty sure a murder charge might be coming and we'll start to work on the murder case and talk to them about it. That does happen.

PC/1015.

A *Strickland* claim of ineffective assistance ordinarily requires a

showing of both deficiency and prejudice. While prejudice often requires a

complex analysis, in this case it is simple. Any reasonably competent defense

attorney, or staff investigator acting on one's behalf, would have advised Mr.

Campbell not to speak to the police. Every bit of evidence in this case shows

that if Mr. Campbell had been so advised he would have heeded that advice.

If all of the five statements had not been given, but even if the last and most

damaging statement at the jail alone were removed from consideration, there

would have been a reasonable probability of a different outcome. In this case,

without Mr. Campbell's confessions, there is a reasonable probability that he

would have been convicted of a lesser included offense to capital murder.

The circuit court found that the defense attorneys were under no obligation to do anything for Mr. Campbell until the first appearance hearing. PC/1184. Assuming without agreeing that that may be so under the Florida statutory scheme, this claim must still be analyzed under the reasonableness and prevailing norms doctrine of *Strickland*. The defense is not arguing for a broad new standard of practice to be followed in all cases, or even in all capital cases. Instead, the unique circumstances of this case involving the highly publicized details of the murder; the high-speed chase ending in a dramatic crash; Mr. Campbell's known location at Bayfront Medical Center, and the concentration of all of the relevant events within Fifth Judicial Circuit placed greater responsibility on the Office of the Public Defender.  It was a virtual certainty that the public defender would be appointed to represent Mr. Campbell. Day after day elapsed with continued publicity and counsel did not arrive to help protect Mr. Campbell's rights. At least, the Public Defender's Office, and Mr. Lewan in particular, had a professional obligation to initiate contact sooner than they did, six days after the car crash. The unchallenged testimony in this case is that preemptive early contact is the prevailing norm of capital defense practice in highly-publicized murder cases. The trial attorneys testified that there existed no impediment to making early contact prior to a formal appointment. PC/980-

81, 1016. In fact they testified that they themselves have done so on other occasions. *Id.*

Under these unique circumstances, the circuit court erred in holding that deficient performance did exist in counsel's failure to make earlier contact with Mr. Campbell. Prejudice is manifest, and therefore Mr. Campbell's conviction of guilt should be vacated.

### b. The Trial Court Erred in Excluding the Expert Testimony of Norman Tebrugge at the Evidentiary Hearing

Norman Adam Tebrugge ("Tebrugge") was tendered as an expert witness at the evidentiary hearing in support of the claim asserting ineffective assistance of counsel for failure to provide prompt assistance with Mr. Campbell. PC/1029. Tebrugge graduated from law school with high honors in 1984, defended over one hundred homicide cases and twelve cases involving the death penalty over the course of a thirty year career. PC/829-33. From 1995 to 2008, Tebrugge was on the Death Penalty Steering Committee of the Florida Public Defender Association and he planned the annual Florida "Life Over Death" training conference for hundreds of capital defenders statewide, often delivering the keynote presentation on Florida's capital punishment scheme. PC/1033-34. He teaches a death penalty seminar at Thomas Cooley Law School. PC/1030. Tebrugge is intimately familiar with counsel's duties in capital cases as well as the ABA Guidelines

for the Appointment and Performance of Defense Counsel in Death Penalty Cases. PC/830-33, 1035. Further, Tebrugge has testified six times as an expert witness in cases in which ineffective assistance of counsel was an issue. PC/1030-31.

Tebrugge was tendered by the defense to give expert testimony on the prevalence and importance of attorney rapid response in capital cases. This is a significant part of Mr. Campbell's first claim for relief. PC/535-40. In his report, Tebrugge stated that he always stressed the need for "rapid response" in capital cases in his presentations. PC/830-33. "Once an arrest is made in a homicide case . . . a member of the public defender staff, preferably an attorney, should make contact with the defendant." PC/833. Immediate contact is critically important to advise a defendant of his constitutional rights and to determine if a defendant is indigent or in need of an attorney. *Id.* Tebrugge's expert testimony regarding the prevalence and necessity of attorney "rapid response" in capital cases was barred by the court. PC/1043-44.

Relevant evidence is any evidence tending to prove or disprove a material fact. Expert testimony should not be prohibited for relevant evidence including claims of ineffective assistance of counsel. Tebrugge's testimony would have been relevant and admissible. As a thirty-year veteran

with immense experience in the field of capital defense, Tebrugge had specialized knowledge that would have assisted the trial court in understanding the prevalence and necessity of rapid response in homicide cases throughout the State of Florida. Tebrugge's testimony was based on his extensive knowledge of capital defense from decades of practicing and teaching. He thoroughly reviewed Mr. Campbell's records and has a deep understanding of the ABA Guidelines. There was nothing unreliable about Tebrugge's principles or methods.

Counsel for the State objected to Tebrugge's testimony on the basis that it would address ineffectiveness of counsel. PC/1036. The objection was sustained, and the court refused a proffer of Tebrugge's testimony. PC/1039. Tebrugge's testimony would have been probative, relevant, and completely permissible under Florida's Evidence Code and it was improperly barred by the circuit court.

(b)    If you did not exhaust your state remedies on Ground Two, explain why: **Not applicable**.

(c)    **Direct Appeal of Ground One:**
(1) If you appealed from the judgment of conviction, did you raise this issue?
☐ Yes        ☒ **No**

(2) If you did not raise this issue in your direct appeal, explain why:
**It could not be raised in the direct appeal because it pertains to the denial of relief of Mr. Campbell's postconviction motion based on ineffective assistance of trial counsel.**

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
☒ **Yes**      ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
**Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851.**

Name and location of the court where the motion or petition was filed:
**Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.**

Docket or case number (if you know):
**2010-CF-1012**

Date of the court's decision:
**August 30, 2017**

Result (attach a copy of the court's opinion or order, if available):
**Denied.**

(3) Did you receive a hearing on your motion or petition?
☒ **Yes**      ☐ No

(4) Did you appeal from the denial of your motion or petition?
☒ **Yes**      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
☒ **Yes**      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

**Supreme Court of Florida, 500 South Duval Street, Tallahassee, Florida 32399.**

Docket or case number (if you know):
**SC17-1725**

Date of the court's decision:
**November 29, 2018.**

Result (attach a copy of the court's opinion or order, if available):
**Denied**.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:
  **Not applicable.**

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:
  **There are no other available procedures.**

## GROUND THREE

**THE CIRCUIT COURT ERRED IN DENYING MR. CAMPBELL'S CLAIM THAT TRIAL COUNSEL RENDERED PREJUDICIAL INEFFECTIVE ASSISTANCE FOR FAILING TO OBJECT TO IMPROPER COMMENTS BY THE STATE, DENYING MR. CAMPBELL HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The prosecutor in this case made several statements in both the guilt and penalty phase trials which constituted prosecutorial misconduct. Trial counsel failed to object to five of these statements and in the sixth instance,

failed to take the necessary precautions to ensure the jury was not tainted from hearing the improper comment. The trial court ruled that any inaction taken towards improper statements made during the penalty phase were now moot due to the granting of a new penalty phase. PC/1187. Thus, the trial court only granted an evidentiary hearing for statements which occurred during the guilt phase, specifically, subsections 1 and 6. PC/1179.

Prosecutorial misconduct occurs when the remarks are not only improper but have prejudicially affected the defendant's substantive rights. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. These failures, individually and collectively, constituted deficient performance by trial counsel, and prejudiced Mr. Campbell.

First, during the guilt phase trial, Mr. Campbell testified in his own defense. Trial counsel testified at the evidentiary hearing that part of the reason for his testimony was to attack the heightened premeditation element. PC/1012-13. During the State's closing arguments, the following statement was made in reference to Mr. Campbell's trial testimony:

> It's been proven that the witness was convicted of a felony.
> Well, we know that defendant is not a one-time convicted

> felon or a four-time convicted felon, he's a seven-time convicted felon. But he was stressed and he was depressed, he was in a fog, he was in a daze, he was in shock, it didn't register, he couldn't piece it together.
>
> If you want to believe that, go right ahead. I can't stop you. *Let him walk out the back of that courtroom door.*"

R18/617-18 (emphasis added). Trial counsel did not object to this improper statement.

The trial court denied this claim in part because "Mr. Sharkey's strategic decision was not to object but to address it at closing argument to counter the State's statements." PC/1190. However, trial counsel never testified that his failure to object was a strategic decision. During the post-conviction evidentiary hearing, trial attorney Devon Sharkey testified that he was the lead attorney for Mr. Campbell's guilt phase proceedings. When asked specifically why he failed to object to the above statement, Mr. Sharkey stated: "if it was objectionable, I was not aware and I did not think it was one of his stronger statements that he made during closing." PC/1012. Mr. Sharkey further stated that the comment during the closing arguments "seemed like a sort of absurd thing for him to say." PC/1013. However, Mr. Sharkey did agree that the statement was misleading to a jury because it was not reasonable to believe Mr. Campbell's testimony and also believe he would "walk out the back of that courtroom door." PC/1013.

Trial counsel should have objected to this improper comment which shifted the burden of proof to Mr. Campbell. Failure to object constituted ineffective assistance of counsel under *Strickland v. Washington* and if objected to, the statement would have caused reversible error. The state cannot comment on a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to believe that the defendant carried the burden of introducing evidence. For that reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt. A prosecutor is also not permitted to denigrate the theory of the defense.

In this case, Mr. Campbell's substantial rights were prejudicially affected because there exists a reasonable probability that, but for the remarks, the outcome of the trial would be different. First, the statement suggests that reasonable doubt does not exist because Mr. Campbell did not create the doubt, and ignores the fact that reasonable doubt can exist due to the State's failure to produce sufficient evidence. Thus, the statement improperly shifts the burden of proof to Mr. Campbell. Further, as trial counsel testified, this statement is incredibly misleading to a jury. PC/1013. The statement discredits the existence of the jury finding any lesser included

crime, arguing that the jury's decision to believe Mr. Campbell's version of events would only result in an out-right acquittal. Rather, the finding of a lesser included crime by the jury could and would result in Mr. Campbell's continued incarceration. In this case, trial counsel failed to make the appropriate objection when this comment was made and rendered prejudicial ineffective assistance of counsel under *Strickland*.

The second statement constituting prosecutorial misconduct occurred during Mr. Campbell's testimony. During the direct examination, trial counsel requested a sidebar with the court after overhearing the prosecutor state: "What a manipulative ass" to his co-counsel. R17/534-36. During the sidebar, trial counsel stated that Assistant State Attorney whispered the inappropriate comment in a loud enough voice that Mr. Sharkey could clearly hear it. R17/534-35. Mr. Sharkey argued his concern that a juror heard the comment as well, especially considering the prosecutor's proximity to the jury box. R17/535. Trial counsel requested a mistrial. R17/535. The prosecutor admitted that he did in fact make the statement to his co-counsel and apologized. R17/535. The trial court denied the mistrial.[8] R17/535.

---

[8] The trial court's denial of the defense objection and request for mistrial were not raised on direct appeal.

However, trial counsel did not request an inquiry into the jury panel to determine whether any jurors heard the statement.

During the post-conviction evidentiary hearing, Attorney Sharkey testified that he clearly recalled the incident when this inappropriate and offense comment was made. PC/1013. Attorney Sharkey testified: "I heard it and I was not pleased." PC/1013-14. However, Attorney Sharkey stated he did not request an individual inquiry into the jury panel. PC/1014.

It is improper for the prosecutor to engage in vituperative or pejorative characterizations of a defendant or witness. Once again, Mr. Campbell's substantial rights were prejudicially affected because there exists a reasonable probability that, but for the remarks, the outcome of the trial would be different. Trial counsel still rendered ineffective assistance of counsel for failing to request that the jurors be individually questioned as to whether they comment was heard. This is especially egregious because Attorney Sharkey testified at the post-conviction evidentiary hearing that the overall guilt phase strategy was to "try to reduce the premeditation aspect to see if we could get a murder 2 out of it, and at the same time try to win as many jurors over for potential life folks in the future if it came down to that." PC/1002. The decision for Mr. Campbell to testify at the trial was made "to give a version of events that reduced premeditation." PC/1019. Thus, the

offensive comment comes during a vital part of the trial – Mr. Campbell's personal testimony regarding the crime, which trial counsel used as their main source of evidence to argue for a lesser conviction. The risk that even one juror overheard this comment, essentially calling into question the veracity of the overall defense theory, was too prejudicial not to explore through questioning the jury.

The trial court denied this claim because "there was no evidence to show the jurors heard the statement. The statement was made while the Defendant was at the witness stand and the jurors' attention was towards the witness." PC/1191. The trial court is simply speculating when it assumes that a juror did not hear the inappropriate comment based solely on the fact that their attention was towards Mr. Campbell at the time. During the side bar, trial counsel Sharkey stated "If I could hear it and I'm not far from the jury and I'm not – I can't be certain that a juror didn't hear that and I think that's extremely inappropriate and I'd ask for a mistrial at this time." R17/535. Mr. Sharkey, who conducted the direct examination, was able to hear the comment while he had his attention towards his client on the witness stand. This assumption is based on no evidence at all. It was completely inappropriate for trial counsel to not further investigate the potential impact this statement had on the jury.

Trial counsel rendered deficient performance under *Strickland* for failing to object, moving for a mistrial, and requesting individual jury *voir dire* for the statements listed above. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. While one of these errors alone are sufficient to warrant reversal, they must be considered both in the context of the other multitude of failures to object to impermissible statements by the State, and the litany of additional instances of ineffective assistance of counsel on the part of trial counsel. As such, Mr. Campbell received prejudiced ineffective assistance of counsel under *Strickland* and should be granted a new guilt phase trial.

(b)    If you did not exhaust your state remedies on Ground Two, explain why: Not applicable.

(c)    **Direct Appeal of Ground One:**
(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes        ☒ **No**

(2) If you did not raise this issue in your direct appeal, explain why: **It could not be raised in the direct appeal because it pertains to the denial of relief of Mr. Campbell's postconviction motion based on ineffective assistance of trial counsel.**

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or

petition for habeas corpus in a state trial court?    ☒ **Yes**    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
**Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851.**

Name and location of the court where the motion or petition was filed:
**Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.**

Docket or case number (if you know):
**2010-CF-1012**

Date of the court's decision:
**August 30, 2017**

Result (attach a copy of the courts opinion or order, if available):
**Denied**

(3) Did you receive a hearing on your motion or petition?
    ☒ **Yes**    ☐ No

(4) Did you appeal from the denial of your motion or petition?
    ☒ **Yes**    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
    ☒ **Yes**    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
**Supreme Court of Florida, 500 South Duval Street, Tallahassee, Florida 32399.**

Docket or case number (if you know):
**SC17-1725**

Date of the court's decision:
**November 29, 2018.**

Result (attach a copy of the court's opinion or order, if available):
**Denied**.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain
why you did not raise this issue:
  **Not applicable.**

(e) **Other Remedies:** Describe any other procedures (such as habeas
  corpus, administrative remedies, etc.) that you have used to exhaust
  your state remedies on Ground One:
    **There are no other available procedures.**

## GROUND FOUR

**THE CIRCUIT COURT ERRED IN DENYING MR. CAMPBELL'S
CLAIM THAT CUMULATIVE ERROR DEPRIVED HIM OF THE
FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE
FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts
  that support your claim.):

Mr. Campbell argues that cumulative error deprived him of his

constitutional right to a fundamentally fair trial, which is guaranteed under

the Sixth, Eighth and Fourteenth Amendments.

The cumulative effect of the number of types of errors involved in Mr.

Campbell's trial dictated the conviction he received. Even if the Court is not

persuaded that relief should not be granted on any one of them, the Court

must consider their cumulative effect. The trial court erred in denying this claim. In considering all aspects of defense counsel's deficient performance as part of a cumulative analysis, Mr. Campbell respectfully requests a new guilt phase trial.

(b)    If you did not exhaust your state remedies on Ground Two, explain why: Not applicable.

(c)    **Direct Appeal of Ground One:**
(1) If you appealed from the judgment of conviction, did you raise this issue?
☐ Yes        ☒ **No**

(2) If you did not raise this issue in your direct appeal, explain why:
**It could not be raised in the direct appeal because it pertains to the denial of relief of Mr. Campbell's postconviction motion based on ineffective assistance of trial counsel.**

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
☒ **Yes**        ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
**Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851.**

Name and location of the court where the motion or petition was filed:
**Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.**

Docket or case number (if you know):

**2010-CF-1012**

Date of the court's decision:
**August 30, 2017**

Result (attach a copy of the courts opinion or order, if available):
**Denied**

(3) Did you receive a hearing on your motion or petition?
　　☒ **Yes**　　☐ No

(4) Did you appeal from the denial of your motion or petition?
　　☒ **Yes**　　☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
　　☒ **Yes**　　☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: **Supreme Court of Florida, 500 South Duval Street, Tallahassee, Florida 32399.**

Docket or case number (if you know):
**SC17-1725**

Date of the court's decision:
**November 29, 2018.**

Result (attach a copy of the court's opinion or order, if available):
**Denied**.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:
　　**Not applicable.**

(e)　　**Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

**There are no other available procedures.**

## GROUND FIVE

**APPELLATE COUNSEL FAILED TO RAISE ON DIRECT APPEAL MERITORIOUS ISSUES WHICH WARRANT REVERSAL OF MR CAMPBELL'S CONVICTIONS AND SENTENCES**

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Significant errors which occurred at Mr. Campbell's capital trial and sentencing were not presented to this Court on direct appeal due to the ineffective assistance of appellate counsel. The issues, which appellate counsel neglected, demonstrate that counsel's performance was deficient and that the deficiencies prejudiced Mr. Campbell. Neglecting to raise fundamental issues such as those discussed herein is far below the range of acceptable appellate performance and must undermine confidence in the fairness and correctness of the outcome. Individually and cumulatively, the claims appellate counsel omitted establish that *confidence* in the correctness and fairness of the result has been undermined. As this petition demonstrates, Mr. Campbell is entitled to habeas relief.

By his petition for a writ of habeas corpus, Mr. Campbell asserts that his capital conviction and sentence of death were obtained and then affirmed during this Court's appellate review process in violation of his rights

guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As this petition demonstrates, Mr. Campbell is entitled to habeas relief.

To establish that appellate counsel was ineffective, *Strickland* requires a defendant to demonstrate (1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance, and (2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.

In order to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

**A. Mr. Campbell received ineffective assistance of appellate counsel due to counsel's failure to raise the claim on direct appeal that the trial court erroneously failed to grant a mistrial when the Assistant State Attorney made a disparaging remark about Mr. Campbell**

Mr. Campbell testified in his own defense during the guilt phase trial. During his direct examination, trial counsel Devon Sharkey requested a sidebar with the court after overhearing the Assistant State Attorney say "what a manipulative ass" to his co-counsel. R17/534-36. During the sidebar, trial counsel argued that Assistant State Attorney whispered the disparaging comment in a loud enough voice that Mr. Sharkey could clearly hear it. R17/534-35. Mr. Sharkey argued his concern that a juror heard the comment as well, especially considering the prosecutor's proximity to the jury box, stating: "If I could hear it and I'm not far from the jury and I'm not – I can't be certain that a juror didn't hear that and I think that's extremely inappropriate and I'd ask for a mistrial at this time." R17/535. The prosecutor admitted that he did in fact make the statement to his co-counsel and apologized. R17/535. The trial court denied the mistrial. R17/535. Trial counsel did not request an inquiry into the jury panel to determine whether any jurors heard the statement. The trial court's denial of the defense objection and request for mistrial were not raised on direct appeal.

During the post-conviction evidentiary hearing, trial attorney Sharkey testified that he clearly recalled the incident when this inappropriate and offense comment was made. PC/1013. Attorney Sharkey testified: "I heard it and I was not pleased." PC/1013-14. However, Attorney Sharkey stated he

did not request an individual inquiry into the jury panel because "my thought is it's going to draw even more attention to the incident and take up more time while the client's on the stand, so I just elected to move on from there." PC/1014.

Mr. Campbell's substantial rights were prejudicially affected because there exists a reasonable probability that, but for the disparaging remarks, the outcome of the trial would be different. It is especially egregious because of the timing of the inappropriate comment. Trial attorney Sharkey testified that the overall guilt phase strategy was to "try to reduce the premeditation aspect to see if we could get a murder 2 out of it, and at the same time try to win as many jurors over for potential life folks in the future if it came down to that." PC/1002. In his view, the worst evidence the State had was Mr. Campbell's August 16, 2010 confession he made to police at the Citrus County Jail PC/1003.[9] PC/1018. The trial attorney agreed that this statement was a sort of "tipping point" between premeditation and heightened premeditation. PC/1018. The defense decision to put Mr. Campbell on the

---

[9] Mr. Campbell gave five incriminating statements to law enforcement after his arrest on August 11, 2010. In Mr. Campbell's final statement on August 16, 2010, he admitted that he had been thinking about committing murder a few days. R17/504-05.

stand was made in part to "counter that statement, to try to give a version of events that reduced premeditation" PC/1019.

Thus, the Assistant State Attorney's offensive comment comes during a vital part of the trial – Mr. Campbell's personal testimony regarding the crime, which trial counsel used as their main source of evidence to argue for a lesser conviction. The Assistant State Attorney's remarks negatively comments on Mr. Campbell's personally credibility and the defense strategy. The risk that even one juror overheard this comment, essentially calling into question the veracity of the overall defense theory, was too prejudicial not to grant a mistrial in order to ensure Mr. Campbell received a fair trial.

In such case as this Court finds that the issue was preserved and could have been raised on direct appeal, appellate counsel provided prejudicial ineffective assistance in violation of the Sixth Amendment when they failed to raise this issue on direct appeal. This error is not harmless. Confidence in the outcome of the appellate process is undermined because had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Campbell's convictions would have been reversed and he would have been granted a new trial.

**B. Mr. Campbell received ineffective assistance of appellate counsel due to counsel's failure to raise the claim on direct appeal that the trial court erroneously permitted unduly prejudicial collateral evidence to be presented at the guilt**

**phase trial**

On the afternoon of Tuesday, August 10, 2010, pursuant to a neighbor's inquiry, Citrus County Sheriff's Officers performed a "well-being check" on the victim's home and found him dead due to blunt trauma to the head. *Campbell v. State*, 159 So. 3d 814, 818 (Fla. 2015). Suspicion immediately fell on Mr. Campbell, his son, who had been living with the victim after his release from prison. On August 11, 2010, a manhunt ensued, which resulted in a high-speed chase where John Campbell removed his seatbelt, slammed the gas pedal to the floor of his vehicle and attempted suicide by ramming a blockade of patrol cars at speeds over 100 miles per hour. *Campbell*, 159 So. 3d at 820. Deputy Sam Ruby was standing outside of his marked vehicle at the time, ready to deploy stop sticks on the highway to deflate Campbell's tires. *Id.* Campbell, who was not wearing a seat belt, was seriously injured and had to be airlifted to Bayfront Hospital in St. Petersburg from the scene of the accident. R16/373-75.

Mr. Campbell was indicted for one count murder in the first degree in Citrus County (Case Number 2010-CF-1012). R1/41. Mr. Campbell was also separately charged with Attempted Murder of a Law Enforcement Officer (Deputy Ruby) in Hernando County as a result of the events surrounding the car crash (Case Number 2010-CF-1820). The collateral case resulted in Mr.

Campbell's guilty plea on December 14, 2011, approximately thirteen months prior to the start of his capital trial. R19/88-89. However, during the capital trial, the trial court erroneously permitted unduly prejudicial evidence of the car chase and subsequent crash to be presented, which became a central feature in the capital trial and which confused and mislead the jury.

During the State's opening statements, the car chase was discussed repeatedly and prominently. Assistant State Attorney Buxman went into great detail about the collateral charge, stating that Campbell "reached speeds of 100 to 120 miles an hour" and that "the evidence will show that the defendant never hit his brakes and hit the patrol car at an incredibly high rate of speed." R14/23-25. The State used particularly inflammatory language to describe the incident, emphasizing the danger to the public and how "law enforcement officers had blocked the road off to make sure no innocent civilians could be injured." R14/23. Further, the State described, Deputy Ruby, who was standing outside of his vehicle at the time, "turned and ran for his life to cover towards the wood line." R14/24.

During the State's case-in-chief, several witnesses were called to discuss the car chase and subsequent crash. During State witness Margaret Driggers' direct testimony, State's Exhibit 20 was moved into entered into evidence and published to the jury over defense objection. R15/173-74. This

exhibit consisted of letters written by Mr. Campbell to Margaret Driggers

while in jail where he provides details about the car crash. R15/175-78. At the

conclusion of Margaret Driggers' testimony, the defense raised an objection:

> Mr. Sharkey: Judge, given the state's opening, they went at some length into this car chase and collision that occurred.
>
> The Court: Yeah.
>
> Mr. Sharkey: And we're not so obtuse as to say that would be not to some degree relevant in this case and not intertwined to some degree. It explains the nature of his injuries, it explains the condition of the car. To some degree perhaps it explains maybe a theory of consciousness of guilt, I'll give them that to maybe some degree.
> But the length that Mr. Buxman went into it in the opening caused alarm to the defense in this case. We feel that it is becoming a feature of this trial and that would not be permissible to bring this other bad act or other bad crime evidence in as a feature and it seemed to me that nearly a third of his opening was spend talking about this chase and collision and I'm concerned this will become a feature of the trial.

R15/181-82. The trial court denied the defense objection and declined any

request for a limiting instruction. R15/184-85.

Immediately after this objection, the State's next witness, Detective

Keszthelyi, testified in great detail about the car chase and subsequent crash.

In fact, the car chase was the basis of his entire testimony. R15/186-212. After

Detective Keszthelyi concluded his testimony, the defense moved for a

mistrial stating that they "believe that the state has made the chase a feature of the trial." R15/213. Trial attorney Sharkey again argued:

> this testimony about the deputy being hurt, this Deputy Ruby, was completely irrelevant and inappropriate. It prejudices our client greatly and we warned the state about bringing this king of evidence in in advance and they've gone over the line, and as the Court says, too much frosting on the cake and we'd ask for a mistrial at this time.

R15/213. The trial court denied the motion for mistrial but notes that the State has "received warning from the defense as to what its perception is." R15/213-14.

The State called one more witness to testify about the car chase. Deputy Andy Cox described in great detail the car chase and crash. R15/215-26. State's Exhibit 23, admitted into evidence during Cox's testimony and published to the jury, is a videotaped recording of the car chase from Deputy Cox's dashboard camera. R15/218. Further, the State referenced the car chase and crash again in its closing arguments noting, among other things, that "the defendant intentionally crashed into Deputy Sam Ruby's marked" vehicle. R18/612.

Collateral crime evidence will not be admissible if it is not similar fact evidence. But evidence can be admissible if the events that it depicted were inextricably intertwined with the crime charged. Like all evidence at trial, evidence of matters inextricably intertwined with the charged offense is

inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Collateral evidence cannot be overemphasized to the point that they become a feature of the trial.

In this case, the State provided testimony and physical evidence regarding the car chase and subsequent crash that became a feature of Mr. Campbell's capital trial. The State discussed the car chase in extensive detail in both their opening and closing arguments. The State then called three witnesses to testify about the car chase and crash. Most alarming, the entire substance of Detective Keszthelyi and Deputy Cox's testimony was in reference to this collateral crime. The State also moved into evidence two exhibits that again reiterate the facts of the chase. State's Exhibit 20 are Mr. Campbell's own words describing the crash. Even more substantial, State's Exhibit 23, is the videotaped recording from Deputy Cox' dashboard camera of the entire chase and crash. While the trial attorneys understandably agreed that the collateral offense was inextricably intertwined with the capital case, the State in this case went too far with the amount of evidence they submitted regarding the car chase and crash, and as a result, prejudiced Mr. Campbell. The probative value of this evidence was substantially outweighed by the danger of unfair prejudice. The amount of evidence about the car crash improperly became a central feature in the capital case and

confused and mislead the jurors.

In such case as this Court finds that the issue was preserved and could have been raised on direct appeal, appellate counsel provided prejudicial ineffective assistance in violation of the Sixth Amendment when they failed to raise this issue on direct appeal. This error is not harmless. Confidence in the outcome of the appellate process is undermined because had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Campbell's convictions would have been reversed and he would have been granted a new trial.

### C. Mr. Campbell received ineffective assistance of appellate counsel due to counsel's failure to raise the claim on direct appeal that the trial court erroneously permitted a highly prejudicial autopsy photograph to be published to the jury

The victim in this case was killed with "a chop-type wound from a sharp implement that also caused blunt injury." *Campbell*, 159 So. 3d 814, 818 (Fla. 2015). The medical examiner, Dr. Kyle Shaw, testified that the victim must have been hit a minimum of three times and that the cause of death was multiple chop and blunt force head injuries. *Id.* at 819.

During Dr. Shaw's direct testimony, the State moved into evidence four photographs from the victim's autopsy. *See* State's Exhibit 35, 36, 37 and 38. Dr. Shaw testified that State's Exhibit 35 shows wounds on the forehead, eye, cheek and the right side of the head. R16/312. State's Exhibit 36 depicts the

right eye with bruising, two lacerations on the forehead, a bruise on the cheek and part of the large wound along the right side of the head. R16/311. State Exhibit 37 shows the primarily large wound along the right side of the victim's head. R16/314.

Dr. Shaw then testified about removing the victim's scalp to examine the skull and brain. R16/315. He continued on in detail about the internal injuries he observed once the scalp was removed including significant brain injury caused by a "five-by-four-inch area of laceration" with bits of embedded tissues, including bone and hair." R16/315-17. Prior to the entrance of State's Exhibit 38, which depicts the victim's injury after his scalp was removed, trial counsel objected stating that this photograph in particular was highly prejudicial. R16/317-318. Specifically, trial attorney Sharkey stated:

> We object to the entry of this exhibit. We believe its probative value is vastly outweighed by the gruesome nature of it and it's highly prejudicial. It would inflame the jurors to look upon this picture. Dr. Shaw has very articulately described the nature of the injuries and to the extent this will assist in his testimony is very minor compared to the degree that it will play the jurors when they see the picture.

R16/318. The trial court denied the defense objection, stating in part "that the defendant essentially takes the evidence of their crime as it is found." R16/318-19.

Otherwise relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Relevant crime scene photographs must be carefully scrutinized by the trial court to determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice and distract from a fair and unimpassioned consideration of the evidence.

While State's Exhibit 38 offered some probative value, its prejudicial effect cannot be denied under any objective standard. First, State's Exhibit 38 was merely cumulative to the three prior autopsy photographs entered into evidence (State's Exhibit 35, 36 and 37) as it depicts essentially the same injury. Further, as Dr. Shaw testified in great detail to the nature of the injuries as he observed during the autopsy, the photograph was merely cumulative. However, the picture was highly inflammatory to the jury. Even relevant photographs sometimes must be excluded if they are unduly prejudicial. Trial attorney Sharkey stated that "to the extent this will assist in [Dr. Shaw's] testimony is very minor compared to the degree that it will play the jurors when they see the picture." R16/318. Admission of State's Exhibit 38 was merely inflammatory and thus gratuitous. As such, trial counsels' objections should have been sustained by the trial court.

In such case as this Court finds that the issue was preserved and could have been raised on direct appeal, appellate counsel provided prejudicial ineffective assistance in violation of the Sixth Amendment when they failed to raise this issue on direct appeal. This error is not harmless. Confidence in the outcome of the appellate process is undermined because had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Campbell's convictions would have been reversed and he would have been granted a new trial.

(b)    If you did not exhaust your state remedies on Ground Two, explain why: Not applicable.

(c)    **Direct Appeal of Ground Two**
(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes       ☒ **No**

(2) If you did not raise this issue in your direct appeal, explain why: **It could not be raised in the direct appeal because it pertains to the denial of relief of Mr. Campbell's post-conviction motion based on ineffective assistance of direct appeal counsel.**

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ **Yes**       ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
**Petition for Writ of Habeas Corpus**

Name and location of the court where the motion or petition was filed:
**Supreme Court of Florida,**
**500 South Duval Street, Tallahassee Florida 32399**

Docket or case number (if you know):
**SC18-260**

Date of the court's decision:
**August 31, 2017.**

Result (attach a copy of the courts opinion or order, if available):
**Denied.**

(3) Did you receive a hearing on your motion or petition?
    ☐ Yes      ☒ **No**

(4) Did you appeal from the denial of your motion or petition?
    ☐ Yes      ☒ **No**

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
    ☐ Yes      ☒ **No**

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:
**The Florida Supreme Court is the highest State appeals court.**

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust

your state remedies on Ground Six:
**There are no other available procedures**

13. Please answer these additional questions about the petition you are filing:
(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?
☒ **Yes**     ☐ No

If your answer is "No," state which grounds have not been so presented and give your
reason(s) for not presenting them:

(b) Is there any ground in this petition that has not been presented in some state or federal
court? If so, ground or grounds have not been presented, and state your reasons for not
presenting them: **No.**

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?     ☐ Yes ☒ **No**

If "Yes," state the name and location of the court, the docket or case number, the type of
proceeding, the issues raised, the date of the court's decision, and the result for each
petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?     ☐ Yes  ☒ **No**
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the raised.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

    (1)    Daniel M. Lewan
             6555 West Richard Drive
             Weeki Wachee, FL 34607

    (2)    T. Devon Sharkey
             Office of the Public Defender
             20 North Main Street
             Brooksville, FL 34601

    (3)    Michael Lamberti
             P.O. Box 6028
             Spring Hill, FL 34611

(b) At arraignment and plea:

    (1)    Daniel M. Lewan
             6555 West Richard Drive
             Weeki Wachee, FL 34607

    (2)    T. Devon Sharkey
              Office of the Public Defender
             20 North Main Street
             Brooksville, FL 34601

    (3)    Michael Lamberti
             P.O. Box 6028
             Spring Hill, FL 34611

(c) At trial:

    (1)    T. Devon Sharkey
             Office of the Public Defender
             20 North Main Street
             Brooksville, FL 34601

    (2)    Michael Lamberti
             P.O. Box 6028
             Spring Hill, FL 34611

(d) At sentencing:

    (1)    T. Devon Sharkey
Office of the Public Defender
20 North Main Street
Brooksville, FL 34601

    (2)    Michael Lamberti
P.O. Box 6028
Spring Hill, FL 34611

(e) On appeal:

    (1)    George D.E. Burden
7th Circuit Public Defender
444 Seabreeze Blvd, Suite 210
Daytona Beach, FL 32118

(f) In any post-conviction proceeding:

    (1)    Julie A. Morley
Federal Defender, Middle District
of Florida
400 North Tampa Street
Suite 2700
Tampa, Florida 33602

    (2)    Mark Gruber,
615 Oakmoss Drive
Brandon, Florida 33511

    (3)    Margaret Russell
Office of the Public Defender
14250 49th Street North
Clearwater, Florida 33762

(g) On appeal from any ruling against you in a post-conviction proceeding:

    (1)    Julie A. Morley
Federal Defender, Middle District

74

of Florida
400 North Tampa Street
Suite 2700
Tampa, Florida 33602

(2)    Mark Gruber,
615 Oakmoss Drive
Brandon, Florida 33511

(3)    Margaret S. Russell
Office of the Public Defender
14250 49th Street North
Clearwater, Florida 33762

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?
☐ Yes        ☒ **No**

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?
☐ Yes        ☒ **No**

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.**

---

** The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment

**This Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody is filed timely. John W. Campbell's judgment of conviction and sentence became final on June 23, 2021 when he was resentenced by the Circuit Court of the Fifth Judicial Circuit in and for Citrus County, Florida.** *See Burton v. Stewart*, **549 U.S. 147, 156 (2007) (final judgment in a criminal case means sentence, the sentence is the judgment);** *Ferreira v. Secretary*, **494 F.3d 1286, 1293 (11th Cir. 2007) (AEDPA's statute of limitations begins to run from the date both the conviction *and* the sentence the petitioner is serving at the time he files his application become final because judgment is based on both the conviction and the sentence). This petition has been filed within 1 year of that date and is**

---

of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in
  violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the
  Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(E) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

**therefore timely.** *See* **28 U.S.C. § 2244(d).**

Therefore, the Petitioner respectfully asks that this Honorable Court grant the following relief:   That this Honorable Court vacate John W. Campbell's judgment of conviction and sentence and grant him a new guilt phase and penalty phase trial, or any other relief to which petitioner may be entitled.

Respectfully submitted,

*John William Campbell*

**JOHN WILLIAM CAMPBELL,**
DOC# D35843
Columbia Correctional Institution
216 S.E. Corrections Way
Lake City, Florida 32025

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**JOHN WILLIAM CAMPBELL,**

    Petitioner,

v.

**JULIE L. JONES, Secretary,**
**Florida Department of Corrections**

    Respondent.

**CASE NO:**
5:22-CV-255 TPB PRL

_____/

**CLERK, US DISTRICT COURT**
**MIDDLE DISTRICT OF FL**
**OCALA FLORIDA**
**2022 JUN -1 PM 12: 47**
**FILED**

**<u>VERIFICATION</u>**

**STATE OF FLORIDA**
**COUNTY OF COLUMBIA,**

    ON this __19__ day of __MAY__, 2022, I, **JOHN W. CAMPBELL**, personally appeared before the undersigned authority after first being duly sworn and say that I am the Petitioner in the above-styled case, that I have read the FEDERAL PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY, and that I have personal knowledge of the facts and the matters therein set forth and alleged; and that each and all of these facts and matters are true and correct.

    FURTHER AFFIANT SAYETH NAUGHT.

_(signature)_

**JOHN WILLIAM CAMPBELL**
DOC# D35843
Columbia Correctional Institution
216 S.E. Corrections Way
Lake City, Florida 32025

SWORN TO AND SUBSCRIBED TO before me this 10th day of

May _____, 20 22 , by **JOHN W. CAMPBELL, DOC#**

**D35843**, who is personally known to me or who provided the following

identification: DOC D35843

Notary Public State of Florida
Rhonda K Davis
My Commission GG 331733
Expires 08/30/2023

_(signature)_
NOTARY PUBLIC, STATE OF FLORIDA
My Commission Expires: